IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Civil No. 1:18CV00632 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| APPROXIMATELY 30 PIT BULL | : | |
| TYPE DOGS, | : | |
| Defendants. | : | |

## **VERIFIED COMPLAINT OF FORFEITURE**

NOW COMES Plaintiff, the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1.      This is a civil action <u>in rem</u> brought to enforce the provisions of 7 U.S.C. § 2156(f) for the forfeiture of thirty pit bull-type dogs that were involved in a violation of the animal fighting venture prohibition section of the Animal Welfare Act, 7 U.S.C. § 2156. This action also seeks the forfeiture of any offspring these seized dogs may have before entry of a final order of forfeiture.

2.      The defendants in rem seized from 1105 Short Street, Salisbury, North Carolina 28144-3844, are as follows:

    a.   USM-173: a black and white, male pit bull-type dog;

    b.   USM-174: an underweight brown and white, female pit bull-type dog;

    c.   USM-175: an underweight black male, pit bull-type dog;

d. USM-176: a brown male, pit bull-type dog;

e. USM-177: an underweight light brown, female pit bull-type dog;

f. USM-178: a black and white, male pit bull-type dog;

g. USM-179: a brown, female pit bull-type dog;

h. USM-180: a black and white, female pit bull-type dog;

i. USM-181: a black and white, female pit bull-type dog;

j. USM-182: an underweight black and white, male pit bull-type dog;

k. USM-183: a light brown, female pit bull-type dog;

l. USM-184: an underweight black and white male, pit bull-type dog;

m. USM-185: an underweight brown and white, female pit bull-type dog;

n. USM-186: a brown and white, male pit bull-type dog;

o. USM-187: a black and white, female pit bull-type dog;

p. USM-188: a brown, male pit bull-type dog;

q. USM-189: a brown, female pit bull-type dog;

r. USM-190: an underweight black, male pit bull-type dog;

s. USM-191: an underweight black and white, female pit bull-type dog.

3. The defendants in rem seized from 1111 Kenly Street, Salisbury, North Carolina 28144-3818, are as follows:

a. USM-192: a black, male pit bull-type dog;

b. USM-193: an underweight red, male pit bull-type dog;

c. USM-194: a brown and white, male pit bull-type dog;

d.   USM-195: a brown and white, male pit bull-type dog;

e.   USM-196: an underweight black, male pit bull-type dog;

f.   USM-197: a white and black, female pit bull-type dog;

g.   USM-198: a red, male pit bull-type dog;

h.   USM-199: a black, male pit bull-type dog;

i.   USM-200: a black, male pit bull-type dog;

j.   USM-201: a black, female pit bull-type dog;

k.   USM-202: an underweight red, female pit bull-type dog.

4.     The defendants in rem were seized on or about June 6, 2018, from the yards of the above-referenced residences located at Kenly Street and Short Street in Salisbury, North Carolina, pursuant to a federal search warrant.   They are currently in the custody of the United States Marshals Service and being cared for by the Humane Society of the United States.

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355. Upon the filing of this complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute upon the properties pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

6.     Venue is proper pursuant to 28 U.S.C. § 1355(b) because acts and omissions giving rise to the forfeiture took place in the Middle District of North Carolina.

7.     The federal Animal Welfare Act, 7 U.S.C. § 2131, et seq., defines "animal

fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to sell, buy, possess, train, transport, deliver, or receive an animal intended for use in an animal fighting venture. 7 U.S.C. § 2156(b).

8. The Animal Welfare Act provides that "[a] warrant to search for and seize any animal which there is probable cause to believe was involved in any violation of this section may be issued by any judge of the United States or of a State court of record or by a United States magistrate judge within the district wherein the animal sought is located." 7 U.S.C. § 2156(f). Animals "seized under such a warrant shall be held by the United States marshal or other authorized person pending disposition thereof by the court in accordance with this subsection." *Id.* In addition, "[n]ecessary care including veterinary treatment shall be provided while the animals are so held in custody." *Id.*

9. The statute also contemplates forfeiture of seized live animals. Specifically,

> [a]ny animal involved in any violation of this section shall be liable to be proceeded against and forfeited to the United States at any time on complaint filed in any United States district court or other court of the United States for any jurisdiction in which the animal is found and upon a judgment of forfeiture shall be disposed of by sale for lawful purposes or by other humane means, as the court may direct.

*Id.* The costs incurred in caring for animals seized and forfeited under this section "shall be recoverable from the owner of the animals (1) if he appears in such forfeiture

proceeding, or (2) in a separate civil action brought in the jurisdiction in which the owner is found, resides, or transacts business." *Id.*

10. The facts and circumstances supporting the seizure and forfeiture of the Defendants *in rem* are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the Defendants *in rem*; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* be forfeited to the United States of America for disposition according to law; that the Court enter a judgment for costs associated with the care of the Defendants *in rem* pursuant to 7 U.S.C. § 2156(f) should any interested party file a claim for the Defendants *in rem*; and that the United States of America be granted such other relief as this Court may deem just and proper.

This the 17th day of July, 2018.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney


/s/ Lynne P. Klauer
Lynne P. Klauer
Assistant United States Attorney
NCSB #13815
101 S. Edgeworth Street, 4th Floor
Greensboro, NC 27401
Phone: (336) 333-5351
Email: lynne.klauer@usdoj.gov



J. BRETT GROSKO
Senior Trial Attorney (Maryland Bar)
MARY HOLLINGSWORTH
Trial Attorney, AZ Bar 027080
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
601 D St., N.W.
Washington, D.C. 20004
202-305-0342 (Grosko)
303-844-1898 (Hollingsworth)
Brett.grosko@usdoj.gov
Mary.hollingsworth@usdoj.gov

*Attorneys for the Plaintiff*

# VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

Jeffery Nickols
Special Agent
U.S. Department of Agriculture
Office of Inspector General

# DECLARATION

I, Jeffery Nickols, a Special Agent with the United States Department of Agriculture ("USDA"), Office of Inspector General ("OIG)"), hereby state, pursuant to Title 28 of the United States Code, Section 1746, under penalty of perjury and pursuant to the laws of the United States, that the following information is true and correct to the best of my knowledge, information, and belief:

1.     I have been employed as a Special Agent with the USDA-OIG since March 2008.   Prior to this, I was employed as a Special Agent with the United States Secret Service since July 2001 and have experience and training in conducting various bank and access device fraud investigations.

2.     I am an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.     As part of my duties as a USDA-OIG Special Agent, I conduct investigations involving animal fighting and animal cruelty crimes.   I have led my office's animal cruelty investigations initiative, serving as the case agent for all animal fighting cases in the state of Michigan.   I have worked as an undercover agent in animal cruelty and fighting investigations, and have been the affiant for numerous search warrants and criminal complaint affidavits relating to animal fighting.   I have testified in both federal and state court cases as an expert witness in animal cruelty and animal fighting investigations.   I have provided training to other law enforcement and public works agencies regarding identifying and investigating animal fighting cases.

GOVERNMENT
EXHIBIT

A

PENGAD 800-631-6989

4. Through training and investigations of persons arrested for animal fighting offenses, I am familiar with the actions, traits, habits, and terminology utilized by handlers or owners of dogs involved in animal fighting ventures.

5. This declaration is based on: information provided by federal agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; the results of physical and electronic surveillance conducted by law enforcement agents; and my experience, training and background as a Special Agent with USDA-OIG. Because this declaration is being filed for the purpose of establishing grounds for forfeiture and providing notice to interested persons, it does not include all of the information known to the Government in connection with the investigation underlying the claims for forfeiture set forth in the Verified Complaint.

6. This declaration is submitted in support of a Verified Complaint of Forfeiture of 30 pit bull-type dogs seized from two locations in Salisbury, NC, associated with KELO MCCAIN ("KELO"), a subject of this investigation, and more specifically identified as follows:

<u>1105 Short Street, Salisbury, North Carolina</u>

    a. USM-173: a black and white, male pit bull-type dog;

    b. USM-174: an underweight brown and white, female pit bull-type dog;

    c. USM-175: an underweight black male, pit bull-type dog;

    d. USM-176: a brown male, pit bull-type dog;

    e. USM-177: an underweight light brown, female pit bull-type dog;

    f. USM-178: a black and white, male pit bull-type dog;

2

g.  USM-179: a brown, female pit bull-type dog;

h.  USM-180: a black and white, female pit bull-type dog;

i.  USM-181: a black and white, female pit bull-type dog;

j.  USM-182: an underweight black and white, male pit bull-type dog;

k.  USM-183: a light brown, female pit bull-type dog;

l.  USM-184: an underweight black and white male, pit bull-type dog;

m.  USM-185: an underweight brown and white, female pit bull-type dog;

n.  USM-186: a brown and white, male pit bull-type dog;

o.  USM-187: a black and white, female pit bull-type dog;

p.  USM-188: a brown, male pit bull-type dog;

q.  USM-189: a brown, female pit bull-type dog;

r.  USM-190: an underweight black, male pit bull-type dog;

s.  USM-191: an underweight black and white, female pit bull-type dog.

1111 Kenly Street, Salisbury, North Carolina

a.  USM-192: a black, male pit bull-type dog;

b.  USM-193: an underweight red, male pit bull-type dog;

c.  USM-194: a brown and white, male pit bull-type dog;

d.  USM-195: a brown and white, male pit bull-type dog;

e.  USM-196: an underweight black, male pit bull-type dog;

f.  USM-197: a white and black, female pit bull-type dog;

g.  USM-198: a red, male pit bull-type dog;

h.  USM-199: a black, male pit bull-type dog;

3

i.  USM-200: a black, male pit bull-type dog;

j.  USM-201: a black, female pit bull-type dog;

k.  USM-202: an underweight red, female pit bull-type dog.

## BACKGROUND

7.     Dog fighting is a violent contest in which two dogs that are bred and conditioned for fighting are released by their owners or handlers in a controlled environment to attack each other and fight for purposes of entertainment or gambling. Fights usually end when one dog withdraws, when a handler "picks up" his dog and forfeits the match, or when one or both dogs die.

8.     American Pit Bull Terriers, commonly called Pit Bulls, are the most prevalent type of dogs used in dog fighting ventures.

9.     Dog fighters select the strongest, most capable fighting dogs and selectively breed, sell, and fight only those dogs that display particular traits. Some of these traits are: (1) "gameness" or aggressiveness and propensity to fight other dogs; (2) a willingness to continue fighting another dog despite traumatic and/or mortal injury; and (3) cardiovascular endurance to continue fighting for long periods of time and through fatigue and injury.

10.     Dog fighters fight dogs with a goal of obtaining "Champion" or "Grand Champion" status for their dogs, which is achieved by winning three or five fights, respectively. They maintain contact with other dog fighters around the country, and can generate substantial income from gambling on dog fights and from the sale and breeding of fighting animals.  Once a dog fighter locates an opponent and agrees upon terms, the

4

match is "hooked," or set up. The dog then undergoes a conditioning process dog handlers refer to as a "keep." A "keep" is typically conducted for six to eight weeks before the scheduled match and involves a training program that may include running and exercising the dogs away from public view, the use of devices such as "spring poles" and "flirt poles" to build jaw strength and increase aggression, and the administration of drugs, vitamins, and other medicine.

11.     Dog fighters typically do not start setting up matches for a dog until the dog reaches at least eighteen months to two years of age. Until then, dog fighters may test the dog out by "rolling" it or having the dog participate in short fights to assess the dog's demeanor. Thus, it is common for dog fighters to possess multiple young dogs who are in the process of being trained to fight.

12.     Dogs who have been fought may have scars, puncture wounds, swollen faces, or mangled ears. Scars from organized dog fights are commonly found on the face and front legs, as well as on hind ends and thighs.

13.     It is a common practice for those involved in training and exhibiting fighting dogs to possess several dogs at one time. This practice is followed for several reasons. First, dog fighters maintain a stock of dogs at different weights and both sexes because in dog fights, dogs are matched against other dogs to within a pound of the same weight against dogs of the same sex. Maintaining a stock of several dogs thus increases the odds of owning a dog whose weight meets the requirements for a match being solicited by an opponent.

5

14. Further, dog fighters must possess an inventory of dogs because dogs often die or are badly injured during fights. Dogs that lose fights or fail to show "gameness" are often killed. It is not uncommon for dogs that lose matches to be killed in cruel, torturous, and inhumane ways as punishment.

15. Dog fighters also maintain multiple dogs in order to selectively breed, sell, and fight dogs displaying certain traits or to otherwise advance a particular dog fighting bloodline. Possessing multiple dogs increases the prospects of owning a dog who will become a Champion or Grand Champion. Dog fighters also routinely test and evaluate their dogs to determine those that exhibit aggressive behavior, including against their own dogs.

16. A dog's "pedigree" is of utmost importance to a dog fighter. Dogs that are used for dog fighting are typically the product of cross-breeding between dogs that have champion pedigrees and bloodlines. Pedigrees will include notations respecting a dog's wins, losses, and earned titles, as well as such information for several generations of the dog's ancestors.

17. The American Pit Bull Terrier Online Pedigrees ("APBT") is a "web based pedigree application" that allows users to add their dog's pedigrees to the website, along with a picture of the dog, and provides a search tool to find pedigrees for thousands of dogs. The website displays "offspring listings, sibling listings and a nice tool that displays the genetic contribution of each dog's ancestor in the first 4 generations." (http://www.apbt.online-pedigrees.com, last visited on June 1, 2018). The APBT web platform also has private chat rooms in which members can communicate with each other through instant messaging chats. The APBT website does not include any contact

6

information for individuals who administer the site. A search through the CLEAR law enforcement database indicates that APBT was incorporated in 2011 in El Paso, Texas. Dog fighters use APBT to post their dog's pedigrees, to research pedigrees for breeding and sales, and to communicate with other dog fighters about dogs and bloodlines.

18.     It is common for dog fighters who fight dogs to possess materials, in paper or electronic form, showing ownership of Pit Bull breed dogs including breeding records, stud fees, receipts, shipping slips, bills of sale, pedigree records, records pertaining to a dog's bloodline, registration records, vaccination records, notes, and ledgers, contracts, training logs ("keeps"), and other written records and agreements concerning the fighting of Pit Bull breed dogs, especially if the materials pertain to dogs that have attained a certain status or title on account of winning fights, or dogs who are offspring of such winning dogs.

19.     Another sign of dog fighting is the presence of pit bull-type dogs on heavy or excessive chains, or housed individually in pens or crates. Persons engaged in dog fighting take steps to restrain or isolate dogs used for fighting from one another to prevent them from fighting at unintended times. They may also keep younger dogs they intend to use for fighting out of reach of other dogs to discourage normal socialization. Heavy chains are used to develop neck strength in dogs used for fighting.

20.     It is common for dog fighters to possess dogfighting paraphernalia used to breed, exercise, train, restrain and strengthen or condition their dogs, including:

> a.   treadmills, including treadmills that are modified to keep a dog from getting off the treadmill;

7

b. "rope hangs"—ropes that dangle animal hides or "lures" that, when gripped by a dog's mouths, result in the dog being suspended entirely off the ground. Rope hangs are commonly used by dog fighters to strengthen and condition a dogs jaw and neck muscles to achieve a better "bite";

c. weighted collars, leashes, chains, and other devices used to exercise or restrain fighting dogs, and weight scales;

d. "break sticks"—sticks of wood, plastic, fiberglass, resin or other material that are used to pry open the jaws of dogs;

e. "flirt poles"—long poles with a hide or fur lure attached that is moved around by a trainer to tease a dog;

21. Dog fighters also often collect and maintain indefinitely in their residences: books, magazines, photographs, film, videotapes, and writings depicting or promoting dog fighting and the training/conditioning of dogs for fighting; awards, trophies, plaques, or ribbons.

22. It is common for dog fighters who fight dogs to possess medical supplies in order self-treat injured dogs or to enhance the performance of fighting dogs. Such items include, but are not limited to animal medications, antibiotics, vitamins, steroids, needles and syringes, suture kits, and other veterinary supplies, which items are often kept as long as an individual is involved in dog fighting, even if dogs are not kept at the dog fighter's residence.

INVESTIGATION

23. At all times relevant to this Complaint:

8

a. KELO was a resident of the house located on the Kenly Street Premises.

b. KELO was a resident of the house located on the Short Street Premises.

c. CHARLES DAVIS, JR. (DAVIS) was an owner and operator of *Stick Wit Me Kennels*," also known as "*SWMK*."

d. CHARLES MILLER (MILLER) was an owner and operator of *Stick Wit Me Kennels*.

e. KELO was an associate of *Stick Wit Me Kennels*.

24.     Since at least March 2017, multiple law enforcement agencies in various counties of western Michigan have been investigating numerous subjects who are involved in promoting dog-fighting ventures and possessing dogs for the purpose of having those dogs participate in fights, in violation of 7 U.S.C. § 2156(a)(1) and (c). The law enforcement agencies involved in the investigation include, among others: Ingham County (Michigan) Animal Control and Ingham County Sheriff's Department, Michigan State Police ("MSP"), and Eaton County (Michigan) Animal Control. Due to the expansive nature of the dog-fighting ventures and overlapping subjects and criminal activity across counties, in November 2017, the Bureau of Alcohol, Tobacco, Explosives & Firearms ("ATF"), the United States Department of Agriculture—Office of Inspector General ("USDA-OIG") and the Federal Bureau of Investigation ("FBI") joined the investigation.

25.     The subjects of the investigation include, among others: Michigan-based subjects MILLER, DAVIS, and North Carolina-based subject KELO, each of whom are involved in the operation, support, or promotion of one or more dog "kennels" that exist

9

solely for the purpose of breeding and training dogs for fighting, as explained in more detail below.

26.     Law enforcement has determined that, under the guise of an organization by the name of "*Stick Wit Me Kennels*," also known as "*SWMK*," DAVIS, MILLER, and others, work together to train fighting dogs, maintain and care for fighting dogs, purchase and breed fighting dogs, and attend and gamble on animal fighting ventures.   The investigation has shown that KELO is an associate and advocate of *Stick Wit Me Kennels*.

27.     Law enforcement has also determined that *Corner to Corner Kennels* is a dog fighting operation owned and operated by KELO.

28.     A review of KELO's publicly-available Facebook account revealed that he is associated with *Corner 2 Corner Kennels* out of Salisbury, North Carolina. A comparison of photographs from the North Carolina offender database and the KELO Facebook account clearly confirm the identification of KELO.



29.     Further review of the KELO Facebook account revealed photographs of KELO, in a photo album labeled "Mexico," in or around November 2014 at what appears to be a dog-fighting event. KELO is shown posing with a pit bull-type dog, for which KELO links a pedigree. The online pedigree #194196 identifies the dog as Grand Champion *Corner 2 Corner's* CAPOEIRA.   The four-generation pedigree shows that CAPOEIRA is bred from game dog lineage.

Case 1:18-cv-00632   Document 1-1   Filed 07/17/18   Page 11 of 19



**GRCH CORNER 2 CORNER'S CAPOEIRA*****

**BREEDER: CHINO STEVE**
**OWNER: KCASHFLOW**
**SEX: FEMALE**
**COLOR: CHOCOLATE RED**
**BIRTHDATE: 2009-07-02**
**ENTERED BY: KCashflow**
**POSTED: 2010-02-27**
**LAST MODIFIED: 2017-10-22**
**PEDIGREE HAS BEEN SEEN: 24788 TIMES**

*She made the BEST of em, look like the REST of em!!!*

**4 GENERATION PEDIGREE**

| First | Second | Third | Fourth |
|---|---|---|---|
| | | CARDENAS KING | CH GONZALEZ' CUBO (4XW) |
| | | | GONZALEZ TOSCA |
| | CARDENAS' CRAZY | CARDENAS' CLEO | CH GONZALEZ' CUBO (4XW) |
| | | | STONE BITER |
| (Sire) CHINO STEVE & WBR'S CRAZY JR | | CARDENAS' CRAZY | CARDENAS KING |
| | | | CARDENAS' CLEO |
| | CARDENAS' SALSITA | CH CARDENAS' SALSA | CH CARDENAS' CHATO |
| | | | CARDENA'S KATRINA II |
| | | CH CARDENAS' CHATO | CH MORFIN'S AFOGUTU (CARDENAS' SHORTY) (4XW) ROM |
| | CARDENAS' RONCO | | MORFIN'S BUNGA |
| | | CARDENAS' MINNIE ME | CARDENAS' STOMPER II |
| (Dam) A. CARDENAS CHOCOLATA 1XW | | | CARDENAS' MILAGROS |
| | | MORFIN'S MARAT. | FONTENOT'S BOOGER |
| | CARDENAS CHAVELA | | MORFIN'S SUIVA |
| | | MORFIN'S BROSA | MORFIN'S MARAT |
| | | | MORFIN'S IAN |

*Information stored in and displayed by: apbt.online-pedigrees.com*

.　　　　　　　　　　　　　　　　　　　　　　.

30.　　Further review of the KELO Facebook account revealed multiple postings of his "Grand Champion" pit bull-type dog, CAPOEIRA. A Facebook "friend" of KELO's commented in March 2018 that CAPOERIA had a litter of puppies six months prior to March 2018, and that she was "in heat" again. The "friend" also commented that CAPEOIRA was eight years old. Based on these comments, and others from KELO's

12

publicly-available Facebook page, CAPOIRA is retired and is being used by KELO for breeding purposes.

## 1105 SHORT STREET, SALISBURY, NORTH CAROLINA

31.    The premises located at 1105 Short Street, Salisbury–the Short Street Premises–is associated with KELO. As discussed above, KELO is the owner/operator of *Corner 2 Corner Kennels*.

32.    A Salisbury Police Department vehicle accident investigation report dated February 15, 2018 identified KELO's home address as 1105 Short St., Salisbury, North Carolina (the Short Street Premises). This same report also identified KELO's telephone number as (704) 431-8088. A database search for KELO's driver's license revealed that KELO has a North Carolina valid driver's license with a registered address of 1105 Short St., Salisbury, North Carolina.

33.    On or about June 6, 2018, federal law enforcement officers executed a search pursuant to a warrant signed by United States Magistrate Judge Peake on June 5, 2018, for the property at 1105 Short Street, Salisbury, North Carolina.  Officers located 19 pit-bull type dogs at the residence. These pit-bull type dogs were kept in a manner indicative of dog fighting activity. No one was present at the residence.

## 1111 KENLY STREET, SALISBURY, NORTH CAROLINA

34.    Police officers and Animal Control officers responded to the residence at 1111 Kenly Street, Salisbury, NC, on January 26, 2017, regarding a cruelty to animals investigation.  They found 42 dogs, most of which were malnourished and had old injuries.  Some were inside the house and some were chained up outside the house. All

dogs found outside of the residence were restrained to the ground with short, heavy metal chains in the same manner and some with similar chain length and thickness to the dogs observed at the Kenly Street Premises on June 6, 2018. During the cruelty to animals investigation on January 26, 2017, the officers made contact with KELO at the 1111 Kenly Street residence and he admitted ownership of the property and all 42 dogs found at the Kenly Street premises.

35.    Following execution of the warrant on June 6, 2018, at the Short Street Premises, officers proceeded to the Kenly Street Premises, which is an address also associated with KELO, and an address at which animal control officers had previously observed KELO with Pit-Bull type dogs kept in a manner consistent with dog-fighting activity. Officers conducted a knock and announce at the Kenly Street Premises at approximately 10:15 a.m. on June 6, 2018. No one responded to the knock. Upon further inspection from the outside of the residence, officers saw household furniture in the residence.

36.    Officers conducted a plain view observation of the Kenly Street Premises. The officers noted that there were approximately ten pit-bull type dogs present in the yard of the Kenly Street Premises. All of the dogs but one were kept on heavy chains. One dog was in a fenced-in kennel. All of the dogs were kept separate from each other.

37.    All of the aforementioned dogs were being kept in a manner or in conditions that were consistent with dog-fighting activity.

14

38.     Near the dog in a fenced in kennel, officers observed a spring pole made of rope. A spring pole is a hanging spring device that is designed so that once a dog bites it, the spring pole suspends the weight of the dog thereby strengthening its bite.

39.     Federal officers spoke with TALITA MCCAIN who asserts that she is the sister of KELO, and she confirmed that KELO is the owner of the Kenly Street Premises and of the eleven Defendant dogs found at the KENLY STREET PREMISES. TALITA MCCAIN also indicated that KELO took care of the dogs at the Kenly Street Premises.

40.     Based on this and other evidence, the United States Attorney's Office applied for and received a search warrant for the Kenly Street and Short Street Premises [1:18MJ152 and 161]. USDA-OIG and ATF agents as well as other local law enforcement executed the federal warrant for the Kenly Street Premises the same day—June 6, 2018.

DEFENDANTS IN REM

41.     During the execution of the warrants for the Kenly Street and Short Street Premises, agents observed that many of the adult Defendants *in rem* had scarring or more recent wounds indicating that those Defendants *in rem* had been involved in organized dog fighting.

42.     The following dogs are among those who exhibited extensive scarring, wounds, sores, or other injuries consistent with organized dog fighting:

      a.     USM-193 (including a swollen jaw, marked scarring over the face, head and ears as well as shoulders and forelimbs, additional scarring over the remainder of the body);

15

b. USM-196 (including scarring over the head, forelimbs, shoulders, and occasional scarring over the remainder of the body)

c. USM-197 (including marked scarring over the face, head and ears as well as shoulders and forelimbs, additional scarring over the remainder of the body);

d. USM-198 (marked scarring over the face, head neck, trunk, as well as additional scarring over the remainder of the body, and an open sore on its ear);

e. USM-199 (marked scarring over the face, head neck, trunk, as well as additional scarring over the remainder of its body);

f. USM-200 (including scarring over the head, forelimbs, shoulders, and occasional scarring over the remainder of its body).

43. The following dogs are among those who exhibited scarring, wounds, sores, or other injuries suggestive of organized dog fighting:

a. USM-175 (including scarring on the face, head, and ears as well as the forelimbs and shoulders);

b. USM-180 (including scarring on the face, head, and ears as well as the forelimbs and shoulders);

c. USM-185 (including scarring on its shoulders).

44. Consistent with dogs possessed and/or trained for participation in an animal fighting venture, all of the dogs were found restrained or housed individually, either near a barrel, a wooden house, or had no cover.

45.    None of the Defendants *in rem* appeared spayed or neutered, which is common among dogs involved in an animal fighting operation.

46.    All but a few of the Defendants *in rem* were infested with fleas, and two have thus far tested positive for intestinal parasites.

47.    At least nine of the Defendant dogs exhibited abnormal skin conditions, including dermatitis, papules and pustules, callusing, erythema, alopecia, crusting, and excoriations.

48.    In sum, the condition in which the Defendants *in rem* were found was not consistent with that of pet dogs of a comparable age.

49.    Additionally, a number of items commonly associated with an illegal dog fighting operation were observed and/or seized from the Kenly Street Premises. For example:

    a.  Veterinary supplies.  Dog fighters often attempt to mend the injuries of their dogs rather than seek veterinary attention, which may raise suspicion regarding the cause of injuries. Thus, it is common to find veterinary supplies where dogs involved in dog fighting are being kept.  The agents observed or seized from the residence the following:

        i.  Syringes;

        ii.  Enrosite—an injectable antibiotic;

        iii.  Dexamethasone Solution-a steroid used to bring down inflammation and swelling that may be used to treat dogs in shock after a fight;

17

      iv.  Duramycin 72-200—an injectable antibiotic made for farm animals. It is common for dog fighters to use medications and veterinary supplies for farm animals because they do not require a prescription from a veterinarian.[1]

      v.  Nutrition products and strength-enhancing supplements.

  b.  A flirt pole;

  c.  Two breaksticks, one of which was signed by a number of well-known dog fighters;

  d.  Dog fighting magazines;

  e.  A poster of a dog fighting magazine from March/April 2015 called "The Connector" displaying the photo of a pit bull-type dog, which is labeled "Grand Champion Capoeira";

  f.  A poster of a dog fighting magazine from Spring 2015 called "Scratchback" displaying the photo of a pit bull-type dog, which is labeled "Corner 2 Corner's Gr. Ch. Capoeira."

50.    The agents observed and/or seized from the Short Street Premises:

  a.  A breeding or "rape" stand, used to immobilize aggressive female dogs during breeding.

---

[1] Law enforcement agents did not observe any farm or other animals on the Kenly Street or Short Street Premises for which these medications could have been intended.

51.     Based on the foregoing, your declarant maintains there is probable cause to believe that the thirty pit bull-type dogs seized from the 1105 Short Street and 1111 Kenly Street, Salisbury, North Carolina residences were involved in a violation of 7 U.S.C. § 2156 and are therefore subject to forfeiture pursuant to 7 U.S.C. § 2156(f).

Dated this ___/7___ day of July, 2018.

Jeffery Nickols
Special Agent
U.S. Department of Agriculture
Office of Inspector General